UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                          :
ALEX C.[1],                     :           NO. 3:22 CV 117(MPS)(RMS)
*Plaintiff,*             :
                          :
V.                          :
                          :
KILOLO KIJAKAZI, ACTING    :
COMMISSIONER OF THE SOCIAL  :
SECURITY ADMINISTRATION,   :
*Defendant.*            :
                          :           DATE: FEBRUARY 16, 2023
                          :
------------------------------------------------------- x

### RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A REHEARING, AND ON THE COMMISSIONER'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Before the Court is an administrative appeal filed by Alex C. ("the plaintiff") pursuant to

42 U.S.C. § 405(g) following the denial of his application for disability insurance benefits ("DIB")

and supplemental security income ("SSI"), alleging disability beginning September 1, 2019.[2] The

plaintiff moves for an order reversing the decision of the Commissioner of the Social Security

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), ("the Act"), this Court identifies and references any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), id. at 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1883(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967, 416.1467. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

Administration ("Commissioner"), or in the alternative, to remand for a rehearing on the grounds that Administrative Law Judge ("ALJ") Matthew Kuperstein erred by: 1) improperly weighing medical opinion evidence; 2) incorrectly formulating the plaintiff's residual functional capacity ("RFC"); 3) failing to develop the record; and 4) failing to meet his burden at step five. (Doc. No. 16-1 at 2). The Commissioner moves to affirm the decision below, arguing that it is supported by substantial evidence. (Doc. No. 18-1 at 25).

For the reasons set forth below, the undersigned respectfully recommends that the plaintiff's Motion for Order Reversing the Decision of the Commissioner, or, in the Alternative, Motion for Remand for a Rehearing, (Doc. No. 16), be **GRANTED** and that that the case be remanded for further administrative proceedings consistent with this ruling. Accordingly, the undersigned respectfully recommends that the Commissioner's Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 18), be **DENIED**.

I.     **ADMINISTRATIVE PROCEEDINGS**

The plaintiff alleges that his disability began on September 1, 2019. (Doc. No. 16-1 at 2; Certified Transcript of Administrative Proceedings, dated December 23, 2021 ("Tr.") 10). On September 9, 2019, the plaintiff filed applications for DIB and SSI. (Tr. 10). The Commissioner denied the plaintiff's applications initially on February 6, 2020, and upon reconsideration on July 2, 2020. (*Id.*).

The plaintiff requested a hearing on September 3, 2020 and appeared with an attorney by telephone before ALJ Kuperstein on April 21, 2021.[3] (*Id.*, citing 20 CFR §§ 404.936(c), 416.1436(c)). Vocational expert ("VE") John Bopp also appeared by telephone and testified. (Tr. 10). On July 8, 2021, ALJ Kuperstein issued an unfavorable decision denying the plaintiff's

---

[3] The hearing was conducted virtually/telephonically due to the extraordinary circumstance presented by the COVID-19 pandemic. (Tr. 10).

request for benefits. (Tr. 10-24). On November 26, 2021, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Doc. No. 16-1 at 2).

On January 21, 2022, the plaintiff filed this action, (Doc. No. 1), and on April 5, 2022, absent consent, the case was referred to the undersigned for all purposes including the issuance of a recommended ruling. (Doc. No. 13). On March 21, 2022, the Commissioner filed the certified administrative record. (Doc. No. 11). On May 5, 2022, the plaintiff filed a Consent Motion for Extension of Time to file a motion to reverse the Commissioner's decision, (Doc. No. 14), which the undersigned granted. (Doc. No. 15). On June 21, 2022, the plaintiff timely filed his Motion to Reverse the Decision of the Commissioner, or, in the Alternative, for Remand for a Rehearing, (Doc. No. 16), together with a Statement of Material Facts, (Doc. No. 16-2), and a brief in support. (Doc. No. 16-1). On July 21, 2022, the Commissioner filed its Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 18), together with a responding Statement of Material Facts, (Doc. No. 18-2), and a brief in support. (Doc. No. 18-1).

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts. (*See* Doc. Nos. 16-2; 18-2). The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

The plaintiff has a GED and has not worked since September 1, 2019. (Tr. 58, 73). He stopped working because he was experiencing severe pain in his right femur bone and was emotionally unstable. (Tr. 58).

At the time of the alleged onset of the plaintiff's disability, he struggled to stand and sit. (*Id.*). At the suggestion of his physical therapist, the plaintiff elevated his legs above his heart for comfort while seated. (Tr. 58, 60). If he did not elevate his leg or take pain medication, then he experienced pain in his knee, hip bone, and femur while seated. (Tr. 60). The plaintiff also struggled to complete daily chores and to focus, and he often felt nervous and jittery. (Tr. 58).

The plaintiff had surgery on his right femur in January 2020. (Tr. 59). Rather than undergo knee reconstruction surgery in 2021, the plaintiff tried wearing a knee brace for a couple of months. (*Id.*). While wearing the knee brace in his house, he was able to stand and sit for approximately 15 or 30 minutes before his knee and joints became swollen. (*Id.*). To avoid discomfort, the plaintiff moved his hip from side to side and did exercises he learned in physical therapy. (*Id.*).

The plaintiff could walk approximately 75 percent of a city block (400 feet) before he needed to sit for approximately three to five minutes. (Tr. 60). Although the plaintiff wore only a knee brace to walk while he was at home, he also used a cane for assistance walking outside of his home. (Tr. 61). He needed to lie down for 45 minutes to an hour at least four times per day. (Tr. 65). He struggled to walk up and down stairs. (*Id.*). He could not lift more than a gallon of milk or bend over without losing his balance because of damage he sustained to his leg muscles. (Tr. 62). The plaintiff suffered from chronic knee pain even when he took medication. (Tr. 62-63). He described his daily pain as an eight out of ten without medication, and a three-to-five out of ten when he is medicated. (Tr. 63). The plaintiff's best friend took him to all of his doctor appointments. (Tr. 67).

The plaintiff also struggled to concentrate and maintain his interest; his therapist had recently diagnosed him with attention deficit disorder ("ADD"). (Tr. 64). He had trouble remembering how to do basic tasks and struggled to trust other people. (Tr. 66-67).

4

The last time the plaintiff used cocaine was when he relapsed in October 2019. (Tr. 69). He had a prescription for medical marijuana, which he used to alleviate his pain, anxiety, and panic attacks. (Tr. 70).

The plaintiff had not left Connecticut since he stopped working. (Tr. 67). He had planned a trip to visit his brother in Florida but canceled it because he could not sit down for the length of the plane ride. (Tr. 71).

### B.     The Vocational Expert's Hearing Testimony

VE Bopp also testified at the plaintiff's hearing. He explained the plaintiff's RFC using various hypothetical scenarios. (Tr. 72-79).

The ALJ presented VE Bopp with a hypothetical involving an individual between ages 47 and 49 with a high school education and no relevant work experience, who was limited to lifting and/or carrying 20 pounds occasionally and ten pounds frequently; standing and/or walking with normal breaks for four hours out of an eight-hour workday; walking long distances and/or on uneven terrain with a cane; lifting and/or carrying small items; sitting with normal breaks for six hours out of an eight-hour workday; never climbing ladders, ropes, or scaffolding; never kneeling, crouching, or crawling; climbing ramps and/or stairs occasionally; being exposed to hazards such as machinery or heights occasionally; never being exposed to unprotected heights or slippery surfaces; and interacting with the public, coworkers, and supervisors occasionally. (Tr. 73-74). VE Bopp testified that such an individual could do the work of a small products assembler, which required light exertion and amounted to approximately 300,000 full-time jobs nationally; a collator operator, which required light exertion and amounted to approximately 40,000 full-time jobs nationally; and a document preparer, with required sedentary exertion and amounted to approximately 15,000 full-time jobs nationally. (Tr. 74-75).

VE Bopp opined that, if the same individual was further limited to standing and/or walking with normal breaks for two hours out of an eight-hour workday, he would be able to do the work of a document preparer and a small products assembler, but not a collator operator. (Tr. 75). VE Bopp further opined that an individual with that additional limitation would also be able to do the work of a cutter and paster, which required sedentary exertion. (*Id.*).

VE Bopp testified that, if the same individual was further limited to lifting and/or carrying ten pounds occasionally and less than ten pounds frequently, he could do the work of a document preparer, a small products assembler, and a cutter and paster. (Tr. 76). He added that the tolerance for off-task behavior and regularly scheduled work breaks during a typical workday was approximately ten percent for a document preparer and a cutter and paster, and five percent for a small products assembler. (*Id.*). According to VE Bopp, the tolerance for unscheduled absenteeism for these professions was generally less than one absence per month and approximately eight per year. (Tr. 77).

Finally, VE Bopp opined, based on his four years of experience providing vocational rehabilitation services, that if the same individual needed to keep his leg elevated above his chest due to swelling, he would not be able to perform any job. (Tr. 78).

### C.    Objective Medical Evidence

#### 1.    Physical Impairments

First, the ALJ considered the plaintiff's musculoskeletal impairments. (Tr. 18). Radiographs of the plaintiff's lumbar spine and right knee showed early degenerative changes. (Tr. 18, citing Tr. 471, 473). Radiographs also showed a malunion fracture of the distal right femur. (Tr. 18, citing Tr. 636). An August 12, 2019 examination showed that the plaintiff had limited range of motion in his knees, lumbar spasm, and back pain with flexion and extension. (Tr. 18,

citing Tr. 452). Notes from the plaintiff's surgical consultation on November 19, 2019 showed that he had 5/5 strength in his lower extremities and that he walked with a corrected gait. (Tr. 18, citing Tr. 504-05).

On January 10, 2020, the plaintiff underwent a successful right femur osteotomy performed by Andrew Grose, M.D. (Tr. 18, citing Tr. 507). Dr. Grose conducted a postsurgical examination of the plaintiff on January 23, 2020, during which he observed that the plaintiff was "doing quite well" and was controlling his pain with medication. (*Id.*). The plaintiff was non-compliant with postsurgical physical therapy, however, attending five sessions, cancelling two, and missing six. (Tr. 18, citing Tr. 643).

Although the plaintiff injured his right knee in a February 2020 car accident, examination showed that he had full range of motion in that knee, as well as in his upper and lower extremities. (Tr. 19, citing 514). The plaintiff achieved increased range of motion in his right knee with physical therapy, and he adequately managed his pain with medication. (Tr. 19, citing Tr. 527-45, 894). The plaintiff's physical therapy treatment notes from June 10, 2020 show that he was progressing towards his goals and demonstrated good gait mechanics. (Tr. 19, citing Tr. 1014).  According to notes from the plaintiff's physical therapy appointments on December 1, 2020 and December 7, 2020, the plaintiff did not complain of pain or cramping. (Tr. 19, citing Tr. 1243, 1245).

 Dr. Grose's treatment notes from November 3, 2020 indicate that the malunion correction in the plaintiff's right femur had healed but the arthritis in his right knee was worsening. (Tr. 18, citing Tr. 1229). Although the plaintiff required assistance with his balance after his January 2020 surgery, his strength and balance "significantly improved" with physical therapy. (Tr. 18, citing Tr. 1230). According to treatment notes from the plaintiff's visit to the physical therapist on January 13, 2021, he did not complain of knee pain and tolerated treatment well. (Tr. 18, citing Tr.

1234). Although the plaintiff continued to walk with an assistive device for "personal comfort," he was capable of ambulating without it. (Tr. 19, citing Tr. 1230). On discharge from physical therapy on February 17, 2021, the plaintiff's ability to negotiate stairs was limited due to "eccentric quad control and hip weakness." (Tr. 18, citing Tr. 1230). Treatment notes dated February 22, 2021 indicate that the plaintiff reported that he was walking for exercise. (Tr. 19, citing Tr. 1085). Records from the plaintiff's telehealth visit to a pain management specialist on April 29, 2021 indicate that he sought stronger pain medication to treat his increased pain following physical therapy sessions. (Tr. 19, citing Tr. 1312).

Based on the objective medical evidence of the plaintiff's physical impairments, the ALJ concluded that, although the plaintiff experienced pain and did not reach all his physical therapy goals, his strength and balance significantly improved. (Tr. 19). Moreover, the ALJ did not find any evidence in the record that reflected strength deficits in the plaintiff's upper extremities or sustained difficulty with sitting. (*Id.*). Indeed, there is nothing in the record to suggest that the plaintiff fidgeted, shifted positions, alternated sitting and standing, or otherwise experienced discomfort while seated. (*Id.*). Although the plaintiff continued to use a cane for personal comfort, his physical therapist determined that he did not need it to walk. (*Id.*).

### 2.    Mental Impairments

Next, the ALJ considered the plaintiff's mental impairments. (Tr. 19-20). Jeffrey Cohen, Ph.D., examined the plaintiff in November 2019 at the request of the State agency. (Tr. 19, citing Tr. 496-503). Dr. Cohen performed diagnostic testing of the plaintiff's intellectual function, which revealed that he had a full-scale intelligence quotient ("IQ") of 90, with scores of 108 and 92 on processing speed and working memory, respectively. (Tr. 20, citing Tr. 499). The plaintiff received a score of 32 on the Beck Depression Inventory, placing him in the major depression range of

ongoing functioning. (*Id.*). The Millon Behavioral Medicine Diagnostic Inventory detected that the plaintiff suffered from significant ongoing depression, mood changes, and anxiety. (Tr. 20, citing Tr. 500). During his examination of the plaintiff, Dr. Cohen observed that he was impulsive and had trouble controlling his mood. (Tr. 20, citing Tr. 502).

During a mental health visit on March 17, 2021, the plaintiff reported that he was responding well to psychotropic medications. (Tr. 20, citing Tr. 1102). He further stated that his mood was good, his anxiety was well-managed, and he was sleeping well. (*Id.*). He also denied experiencing mood swings, feelings of depression, or hypomanic symptoms. (*Id.*). The plaintiff's treatment records from his visit to a clinical psychologist on March 22, 2021 show that he had improved his anger management skills and developed strategies to improve his mood. (Tr. 20, citing Tr. 1097). The plaintiff reported that he was doing well and was responsive to therapy. (Tr. 20, citing Tr. 1099). The clinical psychologist observed that the plaintiff was melancholy, but also fully oriented with an appropriate affect, normal speech, intact thought process, and minimally impaired insight and judgment. (Tr. 20, citing Tr. 1098).

Although Dr. Cohen's examination in November 2019 suggested that the plaintiff suffered from significant mental deficits, other record evidence demonstrated that the plaintiff was doing well and that his condition responded positively to treatment. (Tr. 20).

### D.    Medical Opinion Evidence

The ALJ considered the medical opinions of State agency medical consultants Samuel Bridgers, M.D., and Edward Ringel, M.D., (Tr. 20-21, 91-93, 108-10, 124-25, 136-37), as well as State agency psychiatric consultants M. Rosalie McMaster, Ph.D., and David Houston, Ph.D. (Tr. 21, 89-95, 110-12, 125-27, 137-39).

### 1.    Physical Impairments

The ALJ considered the physical residual functional capacity ("PRFC") assessment completed by Dr. Bridgers at the initial level. (Tr. 21, 124-25, 136-37).

In February 2020, after reviewing the evidence available to him at the time of his assessment, Dr. Bridgers concluded that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for six out of eight hours; and sit for six out of eight hours. (Tr. 91). Furthermore, Dr. Bridgers opined that the plaintiff could occasionally stoop and climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, crouch, and crawl. (Tr. 92).

The ALJ also considered the PRFC assessment completed by Dr. Ringel at the reconsideration level. (Tr. 20-21, 124-25, 136-37).

In June 2020, after reviewing all available medical evidence, Dr. Ringel concluded that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for four out of eight hours; and sit for six out of eight hours. (Tr. 124). Furthermore, Dr. Ringel opined that the plaintiff could never kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; occasionally stoop and climb ramps or stairs; and frequently balance. (*Id.*). Dr. Ringel specified that the plaintiff should not be exposed to unprotected heights or slippery surfaces, and that "a medically required hand-held assistive device is necessary for ambulation." (Tr. 124-25). When asked to explain the plaintiff's exertional limitations for standing and walking, Dr. Ringel responded that the plaintiff required a "[c]ane for distance and/or uneven terrain," and later added that "[a] cane for uneven surfaces is reasonable." (*Id.*).

### 2.    Mental Impairments

Next, the ALJ considered the mental residual functional capacity ("MRFC") assessment completed by Dr. McMaster at the initial level. (Tr. 21, 89-95, 110-12).

In December 2019, after reviewing the evidence available to her at the time of her assessment, Dr. McMaster concluded that the plaintiff's limitations were mild with respect to his ability to understand, remember, and apply information; moderate with respect to his ability to interact with others, and to concentrate, persist, or maintain pace; and mild with respect to his ability to adapt and manage himself. (Tr. 89). Dr. McMaster opined that the plaintiff could do work involving three- to four-step instructions and occasional contact with the public. (Tr. 94, 111).

Finally, the ALJ considered the MRFC assessment completed by Dr. Houston at the reconsideration level. (Tr. 21, 125-27, 137-39).

In June 2020, after reviewing all of the plaintiff's treatment records, Dr. Houston concluded that the plaintiff had the same mild and moderate limitations that Dr. McMaster had previously identified. (Tr. 122, 134). Like Dr. McMaster, Dr. Houston noted that the plaintiff could do work involving three- to four-step instructions and occasional contact with the public. (Tr. 236). Dr. Houston opined that the plaintiff could interact with coworkers and supervisors, as well as adapt to routine changes. (Tr. 126, 138).

### E.    The ALJ's Decision

On July 8, 2021, the ALJ made several findings in his decision that are subject to review by this Court. (*See* Tr. 13-24).

Following the five-step evaluation process,[4] the ALJ found that the plaintiff met the insured status requirements through June 30, 2023, and that he had not engaged in substantial gainful activity since September 1, 2019, the alleged onset date. (Tr. 13).

At step two, the ALJ found that the plaintiff had the following severe impairments: obesity; post-traumatic stress disorder ("PTSD"); mood disorder; anxiety disorder; degenerative disc disease; arthritis of the right knee; and non-union of the right femoral shaft. (*Id.*, citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

The ALJ determined that the plaintiff had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for a total of four

---

[4] "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22 CV 26(VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining in a Social Security case that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI"). An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, however, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, however, then an ALJ must compare the claimant's impairment with those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, however, then the claimant must show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that he cannot perform her former work, then the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). A claimant is entitled to receive disability benefits only if he shows that he cannot perform his former work and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

hours out of an eight-hour workday with a cane for distance and/or uneven terrain ambulation, and could lift and carry small items in his free hand while ambulating with a cane in the other; sit with normal breaks for a total of six hours out of an eight-hour workday; never climb ladders, ropes, or scaffolds; never kneel, crouch, or crawl; occasionally climb ramps or stairs; occasionally stoop; frequently balance; occasionally be exposed to hazards such as machinery or heights; never be exposed to unprotected heights or slippery surfaces; and do simple work with occasional contact with the general public and occasional interaction with coworkers and supervisors. (Tr. 16).

At step four, the ALJ found that the plaintiff had no past relevant work. (Tr. 22, citing 20 C.F.R. §§ 404.1565, 416.965). Finally, at step five, the ALJ considered VE Bopp's testimony[5] in conjunction with the plaintiff's age, education, work experience, and RFC, and concluded that the plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 23). Accordingly, the ALJ concluded that the plaintiff had not been under a disability at any time between September 1, 2019, and July 8, 2021, the date of the ALJ's decision. (*Id.*, citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).

## III.    STANDARD OF REVIEW

Disabled individuals are entitled to receive benefits under the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), 1381a. To be considered disabled and therefore entitled to DIB and SSI, a claimant must demonstrate that he is unable to work "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is

---

[5] VE Bopp testified that an individual with the plaintiff's RFC could perform work as a small products assembler and a collator operator. (Tr. 74-75). During the hearing, the ALJ identified a conflict between the plaintiff's RFC, which reflected a four-hour standing and walking capacity, and the Dictionary of Occupational Titles ("DOT"), which provided that the jobs of small products assembler and collator operator required up to six hours of standing and walking. (Tr. 78). In his decision, the ALJ acknowledged the VE's extensive experience, including his observations of employees in the workplace, job placements, and conversations with employees; his extensive education and training in vocational rehabilitation; and his "more up-to-date information than the information contained in the DOT and the SCO (Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles)." (Tr. 23). For these reasons, the ALJ accepted VE Bopp's testimony despite its conflict with the DOT. (*Id.*).

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(c) (requiring that an impairment or combination thereof "significantly limit[] . . . physical or mental ability to do basic work activities" to be considered "severe").

When an ALJ determines that a claimant is not disabled and the Commissioner upholds the ALJ's decision, the claimant may seek judicial review by a district court. *See* 42 U.S.C. § 405(g). In this capacity, the district court performs "an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). When reviewing a denial of benefits, a district court may not make a *de novo* disability determination. *Wagner v. Sec'y of Health & Human Serv's*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the ALJ applied the correct legal principles in reaching his conclusion, and whether his decision is supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)). Absent legal error, the district court may not set aside an ALJ's decision if it is supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Stated otherwise, if an ALJ's decision is supported by substantial evidence, then that decision will be sustained, even where there may also be substantial evidence to support a claimant's contrary position. *Id.*

"Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). The substantial

evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted). "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

## IV.  DISCUSSION

The plaintiff claims that the ALJ erred in multiple respects. First, the plaintiff contends that the ALJ's evaluation of his subjective complaints and RFC determination are not supported by substantial evidence since they are based on the ALJ's own opinion and do not incorporate "persuasive" medical opinions in the record. Next, the plaintiff alleges that the ALJ failed to develop the record in that he did not obtain the medical or psychological opinions of any of the plaintiff's treating doctors. Finally, the plaintiff argues that the ALJ's finding at step five is not supported by substantial evidence because it is based on the unsupported testimony of VE Bopp, which conflicts with the DOT and SCO.

The Commissioner disputes the plaintiff's arguments, asserting instead that substantial evidence supports the ALJ's evaluation of the plaintiff's subjective complaints and RFC determination; no further development of the record was required; and substantial evidence supports the ALJ's step-five finding.

A. **The ALJ Properly Evaluated the Medical Evidence in Determining the RFC.**

1. **The ALJ's Evaluation of the Plaintiff's Mental Impairments**

The Court begins by addressing the plaintiff's contention that the ALJ improperly assessed the medical opinion evidence in the record regarding the plaintiff's mental impairments. (Doc. No. 16-1 at 8-10).

a. **Objective Medical Evidence**

First, the ALJ considered the findings in Dr. Cohen's examination report dated November 25, 2019, which shows that the plaintiff had an IQ of 90 and a working memory score of 92. (Tr. 15, citing Tr. 499). The ALJ also cited mental status examination findings demonstrating that, between November 29, 2019 and February 16, 2021, the plaintiff consistently had normal memory function and intact insight and did not have trouble understanding medical advice and instructions. (Tr. 15, citing Tr. 572, 609, 710, 723, 1042, 1119, 1131, 1193, 1209-10).

Next, the ALJ found that the plaintiff had a moderate limitation in his ability to interact with others. (Tr. 15). The plaintiff testified at the hearing that he rarely left his house, and that he feared and mistrusted others. (Tr. 15, 67). Moreover, Dr. Cohen observed in November 2019 that the plaintiff was oppositional but tried to be cooperative. (Tr. 15, citing Tr. 500). The plaintiff's mental status examination findings from March 2020 through March 2021 demonstrate that he presented with a depressed mood but that he was cooperative and alert; made appropriate eye contact; was fully oriented; and had fluent speech. (Tr. 15, citing Tr. 709, 716, 894, 1102, 1205, 1320).

Regarding the plaintiff's ability to concentrate, persist, and maintain pace, the ALJ found a moderate limitation. (Tr. 15). In November 2019, Dr. Cohen observed that the plaintiff had low-average intellectual functioning with impaired concentration. (*Id.*, citing Tr. 501). The plaintiff's

mental status examination findings between March 2020 and March 2021, however, consistently showed that he presented with a normal attention span and concentration; he was alert; and he followed commands. (Tr. 15, citing Tr. 710, 716, 1102, 1106, 1119, 1131, 1147, 1162, 1209, 1320).

Finally, the ALJ concluded that the plaintiff had a mild limitation in his ability to adapt and manage himself. (Tr. 15). As the ALJ explained, the plaintiff had not required psychiatric hospitalization or intensive outpatient therapy. (*Id.*, citing Tr. 715). Moreover, the plaintiff lived independently and did not require a highly structured environment to function. (Tr. 15). The plaintiff reported in March 2020 that he tended to his own needs and self-care, and that he supported family members during the COVID-19 pandemic. (*Id.*, citing Tr. 709). The record showed that the plaintiff's judgment was intact. (Tr. 15, citing Tr. 1103).

Regarding Dr. Cohen's November 2019 mental status examination of the plaintiff, the ALJ found that it revealed evidence of ongoing depression, mood changes, and anxiety, and that the plaintiff presented as impulsive and unable to control his mood. (Tr. 20, 502). Other evidence in the record, however, showed that the plaintiff's symptoms responded well to treatment. (Tr. 20). Specifically, the plaintiff's March 22, 2021 treatment records indicate that his ability to manage his anger and mood had improved; he reported doing well; and he was responsive to therapy. (*Id.*, citing Tr. 1097-99).

The ALJ also considered evidence of the plaintiff's positive response to psychotropic medication. (Tr. 20). On March 17, 2021, the plaintiff reported that he was doing well with a combination of Latuda, Trazadone, and Hydroxyzine. (*Id.*, citing Tr. 1102). He further reported that his mood was good; he denied mood swings, feelings of depression, hypomanic symptoms, or side effects from the medications; his anxiety was well managed; and he was sleeping well. (Tr.

20). The ALJ acknowledged that, although the plaintiff was described as melancholy during a March 2021 mental status examination, he was otherwise fully oriented with appropriate affect, normal speech, intact thought process, and minimally impaired insight and judgment. (*Id.*, citing Tr. 1098).

### b.    Medical opinion evidence

In addition to the plaintiff's treatment records, the ALJ also considered the prior administrative medical findings. (Tr. 21). In her December 2019 MRFC assessment at the initial level, Dr. McMaster reviewed the evidence available to her at the time of her assessment, including the plaintiff's medical records, and opined that the plaintiff had mild limitations in understanding, remembering, and applying information, as well as in adapting and managing himself; and moderate limitations in interacting with others, as well as concentrating, persisting, and maintaining pace. (Tr. 89, 106). Dr. McMaster further opined that the plaintiff had moderate limitations in his ability to carry out detailed instructions and maintain attention and concentration for extended periods. (Tr. 93, 106). Dr. McMaster wrote that the plaintiff was "[c]apable of 3-4 step instructions for normal work week." (Tr. 94). Dr. McMaster rated the plaintiff's ability to interact appropriately with the public as moderately limited and noted that the plaintiff was "[c]apable of occasional contact with [the general public]." (*Id.*).

In his June 2020 MFRC assessment at the reconsideration level, Dr. Houston reviewed all of the record evidence, including the plaintiff's medical records, and opined that the plaintiff had mild limitations in understanding, remembering, and applying information, as well as in adapting and managing himself; and moderate limitations in interacting with others, as well as concentrating, persisting, and maintaining pace. (Tr. 122, 134). Dr. Houston further opined that the plaintiff had moderate limitations in his ability to carry out detailed instructions; maintain

attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 125-26, 137-38). Dr. Houston explained that the plaintiff was "[c]apable of 3-4 step instructions for normal work week." (Tr. 126, 138). Dr. Houston opined that the plaintiff had moderate limitations in his ability to interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). Dr. Houston noted that the plaintiff was "[c]apable of occasional contact with the general public" and was "able to interact with co-workers and supervisors." (*Id.*). Dr. Houston further opined that the plaintiff had moderate limitations in his ability to respond appropriately to changes in the work setting and was able to adapt to routine changes. (*Id.*).

The ALJ found that the determinations of Drs. McMaster and Houston were supported by specific evidence in the record and reflected a thorough review of the evidence available to them. (Tr. 21). Although the ALJ acknowledged that Drs. McMaster and Houston did not examine the plaintiff or review medical records submitted after they had completed their assessments, he concluded that their findings were consistent with the record evidence as a whole, including the additional evidence submitted by the plaintiff at the hearing level. (*Id.*). Specifically, the ALJ found that the prior administrative medical findings of Drs. McMaster and Houston were consistent with the plaintiff's treatment records showing that the symptoms of his mental impairment improved with therapy and medication, and mental status examination findings demonstrating that the plaintiff did not suffer from any disabling mental limitations. (*Id.*, citing Tr. 1097-99, 1102).

The plaintiff argues that, although the ALJ was persuaded by the opinions of Drs. McMaster and Houston, he did not incorporate all the limitations they assessed into the plaintiff's RFC. (Doc. No. 16-1 at 8-10). Specifically, the plaintiff argues that the ALJ erred by omitting from his RFC determination Dr. McMaster's opinion that the plaintiff was "capable of 3-4 step instructions for normal workweek," and Dr. Houston's opinion that he was moderately limited in his ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (Doc. No. 16-1 at 9, citing Tr. 94, 125-26).

The plaintiff maintains that the ALJ erred by omitting, without explanation, a limitation for jobs requiring three-to-four step instructions, despite Dr. McMaster's opinion that the plaintiff was "capable of 3-4 step instructions for normal workweek." (Doc. No. 16-1 at 9, citing Tr. 94). Although the ALJ does not appear to have considered this aspect of Dr. McMaster's opinion, this omission did not impact the ALJ's RFC determination since the jobs identified by VE Bopp and relied upon by the ALJ at step five are classified as reasoning level two or three.[6] (Tr. 73-75). *See* DOT #208.685-010, 1991 WL 671753 (collator operator); DOT #706.684-022, 1991 WL 679050 (small products assembler); DOT #49.587-014, 1991 WL 672348 (cutter/paster); DOT #249.587-018, 1991 WL 672349 (document preparer). The plaintiff implies, without reference to any supporting case law or other applicable authority, that, because he is limited to understanding and

---

[6] The DOT defines six reasoning development levels. Only the first three are relevant here. The first level is defined thus: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from those situations encountered on the job." U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1991 WL 688702 (4th ed. 1991). The second level is defined thus: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.* The third level is defined thus: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id.*

remembering three- to four-step instructions, he is precluded from reasoning level two and three jobs. (*See* Doc. No. 16-1 at 9). To the contrary, the less restrictive limitation assessed by Drs. McMaster and Houston would not prevent the plaintiff from performing the reasoning level two and three jobs identified by VE Bopp and relied upon by the ALJ at step five. *See Lovell v. Astrue*, No. 2:12 CV 128(JMC), 2013 WL 174886, at *8-9 (D. Vt. Jan. 16, 2013) (collecting cases).

Moreover, although the plaintiff correctly identifies that the ALJ did not include in his RFC determination a limitation in the plaintiff's ability to adapt to routine changes, as assessed by Dr. Houston, VE Bopp testified that an individual limited to work performed in a stable and predictable work environment could perform the jobs he assessed. (Tr. 76-76. 127, 138). The ALJ explained that he opted not to include additional limitations, such as a restriction to a stable and predictable work environment, because such limitations were not supported by the record evidence reflecting only a mild limitation in the plaintiff's ability to adapt and manage himself. (Tr. 15, 23-24).

Finally, to the extent that the plaintiff argues that the ALJ failed to consider Dr. Cohen's opinion regarding his mental impairments, this argument lacks merit. (*See* Doc. No. 16-1 at 7). Although Dr. Cohen found that the plaintiff had difficulty controlling his mood and that the plaintiff's antisocial behavior affected his ability to find steady employment, (Tr. 502), these findings are not medical opinions under the current regulations. Historically, a medical treatment provider's description of symptoms was often considered an opinion under the regulations, but this is not so under the current regulations. *Compare* 20 C.F.R. § 404.1527(a)(1), *and* 20 C.F.R. § 416.927(a)(1) (defining a medical opinion as a judgment regarding the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis; a claimant's capabilities despite his impairments; and a claimant's physical or mental restrictions), *with* 20 C.F.R. § 404.1513(a)(2), *and* 20 C.F.R. § 416. 913(a)(2) (defining a medical opinion as a statement

regarding a claimant's capabilities despite his impairments and whether a claimant has at least one impairment-related limitation or restriction, including mental limitations related to understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, coworkers, or work pressures). Insofar as Dr. Cohen did not assess impairment-related limitations related to the plaintiff's mental functioning, his statements do not constitute medical opinions under the current regulations. *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

In any event, the ALJ expressly considered Dr. Cohen's findings even though they did not constitute medical opinions. (Tr. 20). The ALJ concluded that Dr. Cohen's observations regarding the plaintiff's mental limitations conflicted with record evidence showing that the plaintiff's symptoms responded positively to treatment and that the plaintiff reported doing well. (*Id.*). Dr. Cohen's observations also differed from the examination findings that the plaintiff's mental status was normal. (*Id.*). In reaching his RFC determination, the ALJ accounted for the plaintiff's limitations by limiting the plaintiff to simple work with only occasional social contact. (Tr. 16).

Because the plaintiff has not satisfied his burden of establishing greater RFC limitations than those assessed by the ALJ, *see Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018), the Court finds that substantial evidence supports the ALJ's evaluation of the plaintiff's mental impairments.

### 2.    The Plaintiff's Physical Impairments

Next, the Court addresses the plaintiff's assertion that the ALJ erred in his assessment of the medical opinion evidence in the record regarding the plaintiff's physical impairments. (Doc. No. 16-1 at 10-11).

### a.    Objective Medical Evidence

First, the ALJ considered radiographs of the plaintiff's lumbar spine from August 2019 and October 2019 showing degenerative changes in the plaintiff's right knee and lumbar spine, as well as malunion fracture of his distal right femur. (Tr. 18, 471, 473, 488, 636). The ALJ also considered findings from an August 2019 examination showing that the plaintiff exhibited limited range of motion in his knees, lumbar spasm, and back pain with flexion and extension. (Tr. 18, 452). In November 2019, the plaintiff ambulated with a corrected gait but exhibited full lower extremity strength. (Tr. 18, 504-05).

On January 10, 2020, Dr. Grose performed an osteotomy of the plaintiff's right femur. (Tr. 18, 507). On examination approximately two weeks after surgery, Dr. Grose observed that the plaintiff was doing "quite well" and was managing his pain with pain medication. (*Id.*). Although the plaintiff injured his right knee in a February 2020 motor vehicle collision, he presented on February 16, 2020 with full range of motion in his right knee, as well as in his upper and lower extremities. (Tr. 19, 512-14). Moreover, treatment notes from November 2020 indicate that, although the plaintiff's femur malunion had healed, he complained of worsening right knee arthritis. (Tr. 18, 555-73, 1228-29).

The ALJ considered the improvement to the plaintiff's functionality with physical therapy and a home exercise plan, as well as the plaintiff's ability to control his pain with medication. (Tr. 19, citing Tr. 527-45, 894, 1014). The ALJ noted that the plaintiff exhibited "significantly improved" strength and balance with physical therapy even though his attendance was inconsistent. (Tr. 18-19, 1230). Indeed, treatment notes dated February 22, 2021 show that the plaintiff reported that he was walking for exercise. (Tr. 19, citing Tr. 1085). Although pain management records from April 2021 show that the plaintiff complained of exacerbated pain

caused by physical therapy and requested stronger pain medications, physical therapy records from December 2020 and January 2021 reflect that he consistently denied pain. (Tr. 19, citing Tr. 1234, 1243, 1245, 1312).

The ALJ acknowledged that the plaintiff experienced pain and did not reach all his physical therapy goals, but also noted that the plaintiff's strength, balance, and pain significantly improved with physical therapy and medication. (Tr. 19). The ALJ observed no evidence in the record that the plaintiff had difficult sitting. (*Id.*). Indeed, the record reflects that the plaintiff did not fidget, shift positions, alternate sitting and standing, or otherwise demonstrate discomfort while seated. (*Id.*). The record further reflects that the plaintiff used a cane for comfort while walking, but his physical therapist determined that a cane was not necessary for him to ambulate. (*Id.*). Even so, to accommodate the plaintiff's need for a cane, the ALJ reduced his RFC to light work except for lifting and/or carrying 20 pounds occasionally and ten pounds frequently; standing and/or walking with normal breaks for a total of four hours out of an eight-hour workday; using a cane for distance and/or uneven terrain and while lifting or carrying small items in his free hand; and sitting with normal breaks for six hours out of an eight-hour workday. (*Id.*).

The ALJ properly considered the objective medical evidence in the record and concluded that the plaintiff's pain improved or was controlled with medication; his functioning improved with physical therapy; and his claimed limitations were not supported by the examination findings of his treatment providers. (Tr. 18-19). Accordingly, the Court finds that substantial evidence supports the ALJ's finding that the plaintiff's physical impairments, although severe, were not disabling. *See* 20 C.F.R. §§ 404.1529(c)(2), 404.1529(c)(3)(iv)-(v), 416.929(c)(2), 416.929(c)(iv)-(v) (stating that an ALJ may consider objective medical evidence regarding effectiveness of medication and treatment received by claimant); *Reices-Colon v. Astrue*, 523 F. App'x 796, 799

(2d Cir. 2013) (summary order) (holding that an ALJ may consider claimant's improvement with treatment in concluding that claimant is not disabled); *Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) (summary order) (indicating that an ALJ is not required to accept claimant's complaints without question and may evaluate them in the context of other record evidence).

### b.    Medical opinion evidence

In addition to the plaintiff's treatment records, the ALJ also considered Dr. Ringel's June 2020 PRFC assessment at the reconsideration level. (*See* Tr. 20-21, 124-25, 136-37). Dr. Ringel reviewed all of the record evidence, including the plaintiff's medical records, and opined that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for four hours; and sit with normal breaks for six hours out of an eight-hour workday. (Tr. 124, 136). Dr. Ringel noted that "[a] medically required hand-held assistive device is necessary for ambulation." (*Id.*). As an explanation for the plaintiff's exertional limitations, Dr. Ringel wrote that the plaintiff used a "[c]ane for distance and/or uneven terrain." (*Id.*). Dr. Ringel further opined that the plaintiff could never kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; occasionally stoop and climb ramps or stairs; and frequently balance. (*Id.*). Dr. Ringel indicated that the plaintiff should not be exposed to unprotected heights or slippery surfaces. (Tr. 125, 137). Finally, Dr. Ringel wrote that "[a] cane for uneven surfaces is reasonable." (*Id.*).

The ALJ found persuasive Dr. Ringel's opinion pertaining to the relevant period of disability since it was supported by objective medical evidence in the record that the plaintiff's symptoms improved with medication and physical therapy; that he could walk without the assistance of a cane; and that he walked for exercise. (Tr. 20-21).

The plaintiff contends that the ALJ misstated Dr. Ringel's opinion regarding the plaintiff's use of a cane for assistance while ambulating. (Doc. No. 16-1 at 10). Moreover, the plaintiff argues that Dr. Ringel's opinion is only relevant to the period between September 2019 and June 30, 2020 and does not account for the plaintiff's worsening hip and leg pain. (*Id.*). The Commissioner disagrees. (Doc. No. 18-1 at 7-9).

The record does not support the plaintiff's contention that the ALJ misstated Dr. Ringel's findings regarding the plaintiff's use of a cane. Not only did the ALJ interpret Dr. Ringel's findings accurately, but he also accounted for the plaintiff's use of a cane to ambulate in his RFC determination. (Tr. 16). Contrary to the plaintiff's assertion that Dr. Ringel opined that the plaintiff required a cane for "ambulation [on all surfaces]," (Doc. No. 16-1 at 10), the record reflects that Dr. Ringel wrote in his assessment not only that "[a] medically required hand-held device is necessary for ambulation," but also that "[a] cane for uneven surfaces is reasonable," and that he recommended a "[c]ane for distance and/or uneven terrain." (Tr. 124). The ALJ's RFC reflects Dr. Ringel's findings in that it contemplates the use of a cane for walking long distances and/or on uneven surfaces. (Tr. 16).

The plaintiff also challenges the ALJ's reliance on Dr. Ringel's opinion because it does not account for the period during which the plaintiff's hip and leg pain worsened, but the ALJ expressly stated his conclusion that Dr. Ringel's opinion was consistent with the *entire record*. (Tr. 20-21) (emphasis added). It follows from this conclusion that the ALJ satisfied his duty to consider the record as a whole in evaluating the plaintiff's subjective complaints and formulating the plaintiff's RFC. *See* 20 C.F.R. §§ 404.1545, 416.945, 404.1546(c), 416.946(c).

The Court finds that, in reaching his conclusion that the plaintiff's physical impairments were not disabling and in determining the plaintiff's RFC, the ALJ accounted for the limitations

supported by the entire record. The ALJ considered the impairments to the plaintiff's knee, back, and leg, and limited him to a reduced range of light work requiring lifting and/or carrying 20 pounds occasionally and ten pounds frequently; standing or walking with normal breaks for a total of four hours out of an eight-hour workday; and sitting with normal breaks for a total of six hours out of an eight-hour workday. (Tr. 16, 18-19). The ALJ further accounted for the plaintiff's impairments by determining an RFC for work that required only occasional stooping or climbing of ramps or stairs; frequent balancing; and limited exposure to machinery, heights, or slippery surfaces. (Tr. 16, 18). Moreover, the ALJ expressly stated in his decision that, although the plaintiff's physical therapist concluded that he did not require a cane to ambulate, the RFC contemplated the use of a cane for walking distances and/or on uneven terrain while lifting or carrying small items in the free hand. (Tr. 16, 19).

Insofar as the plaintiff has not satisfied his burden of establishing greater RFC limitations than those assessed by the ALJ, *see Smith*, 740 F. App'x at 726, the Court finds that substantial evidence supports the ALJ's evaluation of the plaintiff's physical impairments.

### B.     The ALJ Did Not Fail to Develop the Record.

The Court turns next to the plaintiff's argument that the ALJ failed to adequately develop the record by neglecting to seek treating source opinions from any of the plaintiff's medical providers. (Doc. No. 16-1 at 11-14).

An ALJ has an affirmative obligation to develop the record adequately. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Whether an ALJ has satisfied this duty is a threshold question—before determining whether the Commissioner's decision is supported by substantial evidence, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also *fully and completely developed the administrative record*."

*Scott v. Astrue*, No. 09 CV 3999(KAM)(RLM), 2010 WL 2736879, at *12 (E.D.N.Y. Jul. 9, 2010) (emphasis added) (internal quotations omitted).

As an initial matter, "[t]he Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Delgado v. Berryhill*, No. 3:17 CV 54(JCH), 2018 WL 1316198, at *8 (D. Conn. Mar. 14, 2018) (internal quotations and citations omitted). "[A] medical source statement is not necessarily required to fully develop the record where 'the record contains sufficient evidence from which an ALJ can assess the [claimant's RFC].'" *Crespo v. Comm'r of Soc. Sec.*, No. 18 CV 435(JAM), 2019 WL 4686763, at *3 (D. Conn. Sept. 25, 2019) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). The "sufficient evidence" standard is satisfied when the medical records considered by an ALJ are "extensive," "voluminous," and include "an assessment of [the claimant's] limitations from a treating physician." *Tankisi*, 521 F. App'x at 34. "In essence, *Tankisi* dictates that remand for failure to develop the record is situational and depends on the circumstances of the particular case, the comprehensiveness of the administrative record, and . . . whether an ALJ could reach an informed decision based on the record." *Holt v. Colvin*, No. 3:16 CV 1971(VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (internal quotations and citations omitted).

The "sufficient evidence" standard is not often met in cases where there is no medical source statement. *See, e.g.*, *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (remanding for failure to develop the record where the ALJ did not obtain a medical source statement from the claimant's treating physician, and "[t]he medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work"); *Cordova v. Saul*, No. 3:19 CV 628(JCH), 2020 WL 4435184, at *4-5 (D. Conn. Aug.

3, 2020) (noting that a medical source statement was "[a]bsent from the record," identifying "important gaps," and holding that "the record should have included a medical source statement").

The existence of a medical source statement in the record is not dispositive, however. *See Delgado*, 2018 WL 1316198, at *7. Indeed, even where the record includes a medical source statement, courts occasionally will remand for failure to develop the record if the medical opinions on record do not sufficiently address a plaintiff's limitations. *See, e.g., Card v. Berryhill*, No. 3:18 CV 1060(AWT), 2019 WL 4438322 (D. Conn. Sept. 16, 2019) (remanding in part because the sole medical source statement on record from the claimant's physical therapist did not address inconsistencies in the record, and the ALJ did not seek clarifications or opinions from the claimant's treating physician); *Swanson*, 2013 WL 5676028 (remanding for failure to develop the record where the ALJ concluded that the claimant had severe physical and mental impairments but the treating source's opinion accounted only for the claimant's mental limitations).

Importantly, *Tankisi* and its progeny, as well as cases interpreting an ALJ's obligation to seek medical source statements to adequately develop the record, address claims raised while the "treating physician rule" was in effect.[7] The "treating physician rule" "of necessity dovetail[ed]" with an ALJ's obligation to develop the record in that it "mandate[d] that the opinion of a claimant's treating physician regarding the nature and severity of [the claimant's] impairments [] be given controlling weight if it [was] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record." *Hoehn v. Colvin*, No. 14 CV 6401L(DGL), 2016 WL 241365, at *2 (W.D.N.Y.

---

[7] The Social Security Administration changed its regulations regarding an ALJ's consideration of medical opinion evidence by eliminating the "treating physician rule" for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5848-49 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. The plaintiff initially filed his disability claim on September 9, 2019; accordingly, the "treating physician rule" does not apply to his claim.

Jan. 21, 2016). Since a medical source statement was likely to be afforded controlling weight under the "treating physician rule," an ALJ's failure to secure one was particularly problematic while the rule was in effect. *See, e.g.*, *Delgado*, 2018 WL 1316198, at *7. The new regulations dispense with the requirement that an ALJ afford controlling weight to a medical source statement from a treating physician, provided that certain conditions are met. *See* 20 C.F.R. § 404.1520c (An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."). Instead, an ALJ considers multiple factors when weighing a medical source opinion, the most important of which are supportability and consistency. *Id.*

Although the Second Circuit has yet to address how the regulation change impacts an ALJ's obligation to obtain a medical source statement and the substantial evidence standard, its holding in *Tankisi* controls. *See Angelica M. v. Saul*, 3:20 CV 727(JCH), 2021 WL 2947679, at *6 (D. Conn. Jul. 14, 2021) (citing *Tankisi*, 521 F. App'x at 33-34). A medical source statement is valuable in that it affords a physician the opportunity to explicitly assess a claimant's limitations and RFC, which are necessary components of a fully developed record, but an ALJ need not always obtain one. *See id.* Even where an ALJ does not afford controlling weight to a physician's treatment notes, a medical source statement is not required if the notes contain a comprehensive assessment of a claimant's RFC. *Tankisi*, 521 F. App'x at 33-34. It follows that, even where, as here, the "treating physician rule" does not apply, remand for failure to develop the record by neglecting to obtain a particular medical source statement depends on the circumstances of each case and is required only if the record does not otherwise "contain[] sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Angelica M.*, 2021 WL 2947679, at *6 (citing *Tankisi*, 521 F. App'x at 34).

Here, the record contains the PRFC assessments completed by Dr. Ringel[8] and the MRFC assessments completed by Drs. McMaster and Houston, both State agency psychologists, at the initial and reconsideration levels, respectively, (*see* Tr. 81-114, 118-28, 130-40), as well as the results from Dr. Cohen's evaluation of the plaintiff in November 2019. (*See* Tr. 496-502).

The plaintiff asserts that, to develop the record fully and formulate his RFC, the ALJ should have obtained the medical opinions of three treating sources: Dr. Grose, Chelsea McIntosh, Psy.D., and Ofer Wellisch, M.D. (Doc. No. 16-1 at 12-13). The plaintiff offers no support for this assertion, however, stating only that "[t]he opinion of [his] medical doctor would help to formulate an accurate RFC." (Doc. No. 16-1 at 11).

Although the ALJ was not obligated to obtain the opinions of any additional medical sources, he asked plaintiff's counsel at the hearing whether the record was complete, thereby providing the plaintiff an opportunity to supplement the record if he wished to do so. (Tr. 53). Plaintiff's counsel responded that she was waiting to receive records from the plaintiff's pain management doctor, so the ALJ decided to leave the record open for two weeks and invited plaintiff's counsel to request additional time, if necessary. (Tr. 54). The ALJ also offered to help plaintiff's counsel obtain the outstanding records. (*Id.*). When asked whether she had any objection to the exhibits contained in the record, plaintiff's counsel stated that she had none. (Tr. 55). Moreover, although it was the plaintiff's duty to prove a more restrictive RFC, the Court is not aware of any efforts he or his counsel made to obtain medical opinion evidence from his treatment providers. *See Smith*, 740 F. App'x at 726 (citing 42 U.S.C. § 423(d)(5)).

---

[8] Although the ALJ considered the PRFC assessment completed by Dr. Bridgers at the initial level, he was not persuaded by Dr. Bridgers' opinion because it was based on the incomplete record evidence available at the initial level and not the more recent evidence submitted at the reconsideration level. (Tr. 21).

The record contained—and the ALJ considered—hundreds of pages of treatment notes from several different medical sources, as well as diagnostic imaging studies, physical therapy treatment notes, and objective findings. Included among the records the ALJ considered were the findings of Drs. Gross and McIntosh.[9] (Tr. 18-19, 506, 555, 731, 948, 1226, 1228). Indeed, the ALJ specifically referenced Dr. Grose's November 19, 2019 surgical consultation with the plaintiff showing 5/5 strength of the lower extremities and ambulation with a corrected gait; the plaintiff's right femur osteotomy performed by Dr. Grose in January 2020; Dr. Grose's postsurgical examination showing that the plaintiff was doing "quite well" and that his pain was controlled with medication; and Dr. Grose's notations, dated November 3, 2020, showing that the malunion correction he performed had healed and that the arthritis in the plaintiff's left knee was worsening. (Tr. 18, citing Tr. 505, 507, 1229). The ALJ also considered Dr. McIntosh's objective examination findings from March 2, 2020 showing that the plaintiff's memory was normal. (Tr. 15, citing Tr. 723). Although the ALJ did not have the benefit of the opinions of Drs. Grose and McIntosh, he relied upon their treatment notes and findings in determining the plaintiff's MRFC and PRFC.

In conjunction with the objective medical source evidence, the ALJ also considered multiple prior administrative medical assessments of the plaintiff's physical and mental limitations by State agency medical and psychological consultants, as was required under the regulations. *See* 20 C.F.R. §§ 404.1520b, 416.920b, 404.1520c, 416.920c.

---

[9] The plaintiff states that he received pain management treatment from Dr. Wellisch, (Doc. No. 16-1 at 12); however, this is not reflected in the record evidence. Indeed, the only mention of Dr. Wellisch in the record is in a pain management progress note dated February 24, 2020. (Tr. 948) ("Has a referral to Dr. Wellisch for pain control."). Although the plaintiff was afforded an opportunity to submit or inform the ALJ of additional written evidence, including records from his treating physicians, the record does not contain any treatment notes or findings authored by Dr. Wellisch.

The Court concludes that the record contained sufficient evidence of the plaintiff's physical and mental impairments for the ALJ to determine the plaintiff's RFC such that he was not obligated to further develop the record.

### C.    The ALJ's Finding at Step Five Is Based on VE Testimony that Conflicted with the DOT.

The plaintiff argues that the ALJ's findings at step five of his analysis are not supported by substantial evidence in that they are based on the testimony of a VE who "testified in a way that is unsupported by any sources . . . [and who] conflated the demands of light exertion and sedentary exertion work." (Doc. No. 16-1 at 15). Moreover, the plaintiff asserts that the ALJ "failed to explain the discrepancy between [VE Bopp's] testimony and the Dictionary of Occupational Titles, . . . and erred in over-relying on the VE's unsupported testimony." (Doc. No. 16-1 at 16, 18).

In response to the plaintiff's argument challenging the ALJ's reliance on VE Bopp's testimony that an individual with the limitations included in the RFC could perform light work, the Commissioner maintains that the plaintiff ignores VE Bopp's testimony that such an individual could perform sedentary jobs. (Doc. No. 18-1 at 22). The Commissioner argues that the plaintiff fails to demonstrate that the ALJ erred since substantial evidence supports his finding at step five that the plaintiff is capable of obtaining jobs that exist in significant numbers in the national economy. *Id.*

A Social Security Administration Policy Interpretation Ruling governs the Commissioner's assessment of whether a job can accommodate a claimant's limitations. SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). The Commissioner "rel[ies] primarily on the Dictionary of Occupational Titles . . . for information about [a job's] requirements" but "may also use [VEs] . . . to resolve complex vocational issues." *Id.* If the ALJ considers the testimony of a VE, then he must be alert to the possibility of "apparent unresolved conflict[s]" between the VE's testimony

and the DOT. *Id.* When a VE testifies about the requirements of a job or occupation, the ALJ "has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT." *Id.* Specifically, an ALJ must "[a]sk the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and [i]f the VE's . . . evidence appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict." *Id.* Where, as here, an ALJ identifies that a VE's testimony is inconsistent with information in the DOT, he "must *resolve* this conflict before relying on the VE . . . evidence to support a determination or decision that [a claimant] is or is not disabled. *The [ALJ] will explain in the determination or decision how he or she resolved the conflict.*" *Id.* (emphasis added).

The Commissioner does not argue that there was no conflict between VE Bopp's testimony and the DOT, or that the ALJ did not have a duty to identify any such conflict. (*See* Doc. No. 18-1 at 21-24). Rather, the Commissioner asserts that "[t]he ALJ recognized the conflict between the vocational expert's testimony and the DOT [and] obtained a reasonable explanation for the conflict."[10] (Doc. No. 18-1 at 24). Moreover, the Commissioner contends that, "[i]n his decision, the ALJ explained that he accepted the vocational expert's testimony based on the expert's 'extensive experience as a vocational expert, including observing employees in the workforce, placing employees in jobs, and talking to employers,' . . . [and his] 'extensive education and training in vocational rehabilitation.'" (Doc. No. 18-1 at 23, citing Tr. 23). But the Second Circuit has expressly rejected this basis for accepting the testimony of a vocational expert. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 93, n.4 (2d Cir. 2019) ("[W]e decline to follow the

---

[10] It is not sufficient for an ALJ to merely identify and inquire into any apparent conflict between a VE's testimony and the DOT; rather, Second Circuit precedent requires that an ALJ *resolve* it. *See Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 93, 94 (2d Cir. 2019) (emphasis added). Moreover, "it is not [a court's] role to speculate as to how or whether that conflict might have been resolved had the Commissioner carried out her responsibility to probe such matters." *Id.*

District Court in inferring that [a VE's] personal observations of the jobs about which she testified led her to conclude that those jobs do not entail overhead reaching. While [a VE's] observations may well explain the apparent discrepancy between her testimony and the [DOT], the fact remains that it is the Commissioner's responsibility to obtain a reasonable explanation for any such discrepancies, and not this Court's obligation to concoct one *post hoc*.") (citations and quotations omitted).

VE Bopp testified at the hearing that an individual who is capable of lifting or carrying 20 pounds occasionally and ten pounds frequently, and who must sit for six hours out of an eight-hour workday, would be able to perform several jobs requiring light exertion, including small products assembler, collator operator, and document preparer. (Tr. 73-75). In addition, VE Bopp stated that an individual who is capable of standing or walking for two hours out of an eight-hour workday would also be able to perform the work of document preparer and small products assembler, but not of a collator assembler, and that this additional limitation would not reduce the number of available jobs in the national economy. (Tr. 75). Finally, VE Bopp opined that an individual who is capable of lifting or carrying ten pounds occasionally, and lifting or carrying less than ten pounds frequently, would be able to perform the work of small products assembler, collator operator, and document preparer without a reduction in the number of available jobs in the national economy. (Tr. 76). Stated differently, VE Bopp testified that the same three light exertion jobs could be performed by an individual, regardless of whether he was capable of performing work at the light exertion level or the sedentary exertion level.

VE Bopp's testimony is not supported by the DOT or the SCO. As defined in the regulations, sedentary work involves lifting no more than ten pounds; frequently sitting; and occasionally walking and standing. *See* 20 C.F.R. §§ 416.1567(a), 416.967(a). In this context,

"occasional walking and standing" has been interpreted to require either walking or standing, or a combination of both, for up to two hours out of an eight-hour workday. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *see also Michaels v. Colvin*, 621 F. App'x 35, 40 (2d Cir. 2015). Light work, by contrast, involves lifting no more than 20 pounds; frequently lifting or carrying up to ten pounds; and "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling." 20 C.F.R. §§ 416.1567(b), 416.967(b). "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

Here, the ALJ identified a conflict between the information in the DOT and VE Bopp's testimony that an individual with the plaintiff's RFC could perform the work of a small products assembler and a collator operator. (Tr. 23) ("A conflict arises because the RFC reflects a 4 hour standing and walking capacity, whereas the DOT provides that those jobs require up to 6 hours of standing and walking."). The ALJ then inquired—albeit cursorily—into the potential conflict he identified. (*See* Tr. 78-79). The ALJ asked VE Bopp whether the DOT addresses "even aspects of light work with regards to more specifics as far as the limits of weights throughout the workday being reduced from 20 pounds or even the stand and walk between two and six hours of a workday." (Tr. 78). VE Bopp replied: "No, those opinions are based again on [his] experience in the field of vocational rehabilitation." (Tr. 79). Even though VE Bopp erroneously denied that the exertional demands of sedentary and light work are described in the DOT, the ALJ did not inquire further into the discrepancy he identified. *(See id.*) It is not the Court's duty to parse out such details; rather, that duty falls squarely on the ALJ. *See Wayne M. v. Saul*, 3:20 CV 465(SALM), 2021 WL 1399777, at *19 (D. Conn. Apr. 14, 2021) (citation omitted). The ALJ failed to fulfill

36

that duty. Accordingly, "[w]here the ALJ does not fully discharge his duty to resolve any apparent conflicts between the VE's testimony and the DOT, remand is appropriate." *Martin v. Saul*, 3:18 CV 914(SALM), 2019 WL 3852580, at *8 (D. Conn. Aug. 16, 2019).

"Because the Commissioner's denial was based on evidence that contained an apparent conflict with the [DOT's] authoritative guidance, and [] the Commissioner failed to take" adequate steps to resolve that conflict, remand is required so that the Commissioner may "conduct the requisite inquiry in the first instance." *Lockwood*, 914 F.3d at 94.

**D.    The Case Is Remanded for Further Administrative Proceedings.**

The plaintiff "prays that this Court reverse the Decision of the Commissioner and award him DIB for the period from September 1, 2019, through the present time, or in the alternative, order the claim remanded for a full and fair hearing." (Doc. No. 16-1 at 19).

"Sentence four of 42 U.S.C. § 405(g) provides that, after reviewing the Commissioner's determination, a court may: 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing.'" *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)). "Reversal for payment of benefits is appropriate where the existing record contains persuasive proof of disability and a remand for further proceedings would serve no further purpose." *Wayne M.*, 2021 WL 1399777, at *19 (citation and quotation omitted).

"The 'no purpose' remand[] . . . is grounded in equitable considerations and is often deployed where prior administrative proceedings and litigation have consumed an inordinate length of time." *Id.* (internal quotation omitted). Although the plaintiff's applications have been pending since September 2019 and have endured a lengthy procedural history, they have not yet been the subject of remand by this Court. Moreover, the plaintiff does not argue that he meets or

equals any of the Listings, which would automatically render him disabled, or that further administrative proceedings would serve no purpose. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

The Court is aware of authority suggesting that where the Commissioner fails to meet his burden at step five, a remand for calculation of benefits may be warranted. *See, e.g., Torres v. Colvin*, No. 3:16 CV 809(JAM), 2017 WL 1734020, at *3-4 (D. Conn. May 3, 2017); *accord Wayne M.*, 2021 WL 1399777, at *20. Here, however, the Court finds it most appropriate to remand for further proceedings so that the ALJ may conduct a new hearing, elicit testimony from a new VE, resolve any conflicts between that VE's testimony and the DOT/SCO, and reach a new determination of disability. *See, e.g., Butts*, 416 F.3d at 104 (holding that it was not an abuse of discretion for the district court to remand for further administrative proceedings where the Commissioner failed to meet her burden at step five); *Lockwood*, 914 F.3d at 94 (remanding for further administrative proceedings after finding error at step five).

Accordingly, the Court recommends that this matter be remanded for further administrative proceedings consistent with this ruling. On remand, the plaintiff should be given the opportunity to supplement the record with medical opinion evidence from his treating physicians.

## V.    CONCLUSION

For the reasons stated above, the undersigned respectfully recommends that the plaintiff's Motion for Order Reversing the Decision of the Commissioner, or, in the Alternative, for Remand for a Rehearing. (Doc. No. 16), be **GRANTED** and that the case be remanded for further administrative proceedings consistent with this ruling. Accordingly, the undersigned respectfully recommends that the Commissioner's Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 18), be **DENIED**.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections must be filed with the Clerk of the Court within 14 days after this recommended ruling is filed. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice of an order or recommended ruling from the Clerk by mail shall have five additional days to file any objection. *See id*. Failure to file a timely objection will preclude appellate review. *See id.*; 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72; *Impala v. U.S. Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to magistrate judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

Dated this 16th day of February 2023 at New Haven, Connecticut.

 /s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge